**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEAL PRESTON | CIVIL ACTION |
| Plaintiff, | |
| v. | COMPLAINT 1:17-cv-08237 |
| BANK OF AMERICA, NATIONAL ASSOCIATION and MERCANTILE ADJUSTMENT BUREAU, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff, NEAL PRESTON, on behalf all others similarly situated, by and through his counsel, James C. Vlahakis, and pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3), brings this civil action against Defendants BANK OF AMERICA, NATIONAL ASSOCIATION, and MERCANTILE ADJUSTMENT BUREAU, LLC ("MAB"):

**I.      Jurisdiction and Venue**

1.      This is a civil action asserting claims pursuant to the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. § 227, et. seq., Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et. seq. and Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1, et. seq.  Jurisdiction is proper because the TCPA and FDCPA are federal statutes.  See, 28 U.S.C. § 1331. Supplemental jurisdiction exists over Plaintiff's ICFA claim.  See, 28 U.S.C. § 1367.

2.      Venue is proper because:  (a) Plaintiff is a citizen of the State of Illinois; (b) Plaintiff resides in LaGrange, Illinois; (c) BOA conducts significant business in this jurisdiction through its credit card and banking services; (d) Plaintiff received telephone calls and letters from BOA in this district; (d) MAB conducts business in this jurisdiction

1

as a debt collector; (d) Plaintiff received telephone calls and letters from MAB in this district.

**II.     Parties**

3.       Plaintiff is "consumer" as defined by 15 U.S.C. § 1692a(3).

4.       Plaintiff incurred "debt[s]", as defined by § 1692a(5), with BOA.

5.       MAB is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6) because it uses the U.S. Postal Office and telephones as instruments of interstate commerce for the principal purpose of the collection of debts.

6.       MAB is an Illinois "licensed collection agency."

7.       According to MAB's website:

Mercantile Adjustement [sic] Bureau is recognized as a leading provider of receivable management services to many of the nation's most renowned lenders, debt purchasers and universities.

Mercantile services the nation's leading credit issuers.

8.       MAB regularly attempts to collect consumer debts.

9.       MAB regularly attempts to collect consumer debts for BOA.

**III.    Summary of Allegations and Claims**

10.      Section (b)(1)(A)(iii) of TCPA makes it unlawful to make any call to cellular telephone using any "automated telephone dialing system" or an "artificial or prerecorded voice" without the consent of the person being called.

11.      As defined by Section 227(a)(1), "automated telephone dialing system" ("ATDS") means "equipment which has the capacity (A) to store or produce number to be called, using a random or sequential number generator; and (B) to dial such numbers."

12.      BOA uses "automatic telephone dialing systems" to contact consumers.

13. According to BOA's website:

> If you provide your contact information, you authorize Bank of America, N.A. or its affiliates to contact you. You agree we may use automatic telephone dialing systems in connection with calls made to any telephone number you provide, even if the telephone number is assigned to a cellular or mobile telephone service or other service for which the called party is charged.

https://www.bankofamerica.com/contact-us/feedback.go

14. In the preceding four years, BOA has dialed tens of thousands of BOA consumers through it "automatic telephone dialing systems."

15. BOA used its "automatic telephone dialing system" when it called Plaintiff at 708-275-6789 after January 11, 2017.

16. Alternatively, BOAS used some form of a "predictive dialer" when it called Plaintiff at 708-275-6789 after January 11, 2017.

17. In 2008, the FCC declared that "a predictive dialer" "constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."

18. According to the FCC's January, 2008 Declaratory Ruling:

> In this Declaratory Ruling, we affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers. In its Supplemental Submission, ACA argues that the Commission erred in concluding that the term "automatic telephone dialing system" includes a predictive dialer. ACA states that debt collectors use predictive dialers to call specific numbers provided by established customers, and that a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists". As noted above, the Commission first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions. The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress. The Commission noted that the evolution of the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention. The Commission noted that it expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology.

See FCC's January 4, 2008, Declaratory Ruling at ¶¶ 12, 13 and 14 (footnotes omitted).

https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

19.     While the FCC's Declaratory Ruling acknowledged, "creditors and debt collectors may use predictive dialers to call [cellular] phones," the FCC declared that in order to have consent to do so, creditors and debt collectors are required to demonstrate that "the [cellular] phone number was provided by the subscriber in connection with the existing debt." FCC's January 4, 2008, Declaratory Ruling at ¶ 14.

20.     If a business calls consumers' cellular telephones through the use of an "automated telephone dialing system" or an "artificial or prerecorded voice", a business is "responsible for demonstrating that the consumer provided prior express consent."

21.     According to the Federal Communications Commission ("FCC"):

> To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed and prerecorded message calls, we conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent. The creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications. Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior express consent.

See, FCC's January 4, 2008, Declaratory Ruling at ¶ 10 (footnotes omitted).

22.     In 2015, the FCC issued a Declaratory Ruling and Order which reaffirmed that the burden to demonstrate consent is on the caller:   "regardless of the means by which a caller obtains consent, under longstanding Commission precedent, the burden is on the caller to prove it obtained the necessary prior express consent if any question of consent is in dispute."  See July 10, 2015, Declaratory Ruling and Order, at ¶ 47. See,  https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1_Rcd.pdf (footnote omitted).

23.     Plaintiff's telephone number is 708-275-6789.

24.     708-275-6789 is a cellular number was assigned to a cellular in 2017.

25. Defendants called 708-275-6789 in 2017.

26. On January 11, 2017, Plaintiff sent a letter to BOA which revoked any prior consent which Plaintiff may have provided to BOA:

> I am requesting that you stop contacting me by telephone and direct all future communications to me in writing at the above address.

27. The FCC has declared that "consumers may revoke consent through any reasonable means." According to the FCC:

> [T]he most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts. This gives consent its most appropriate meaning within the consumer-protection goals of the TCPA. By contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent.

July 10, 2015, Declaratory Ruling and Order, at ¶¶ 55, 56, 58.

28. After January 11, 2017, BOA did not have consent to call Plaintiff with an ATDS or "artificial or prerecorded voice."

29. After January 11, 2017, BOA called 708-275-6789.

30. When BOA called 708-275-6789 after January 11, 2017, it used an ATDS as defined by the TCPA.

31. When BOA called 708-275-6789 after January 11, 2017, it did so without Plaintiff's consent.

32. Although BOA may contend that the equipment it used to call 708-275-6789 after January 11, 2017, is neither an ATDS (as it is defined by the TCPA) or a predictive dialer, BOA cannot say that an employee or agent of BOA used his or her fingers to *individually* dial, press or click, *all ten numbers* of 708-275-6789.

33. On information and belief, after January 11, 2017, BOA called Plaintiff using an artificial or recorded voice.

34. BOA uses MAB to collect consumer debts.

5

35.     MAB promotes that it collects debt using an "automated dialer system" (https://www.mercantilesolutions.com/About.aspx) and a "fully integrated Auto-Dialer system" (https://www.mercantilesolutions.com/Services.aspx).

36.     BOA engaged MAB to collect the consumer debts Plaintiff owes to BOA.

37.     On information and belief, BOA sent 708-275-6789 to MAB.

38.     If BOA did not provide MAB with 708-275-6789, on information and belief, MAB obtained this number by a skip trace service.

39.     Plaintiff did not provide 708-275-6789 to MAB.

40.     If BOA did not provide MAB with 708-275-6789 and MAB obtained 708-275-6789 from skip tracing Plaintiff, MAB would not have consent to call Plaintiff with an ATDS, predictive dialer or artificial or prerecorded message.

41.     MAB began calling 708-275-6789 in July and August of 2017 and made approximately a dozen calls to 708-275-6789.

42.     When MAB called 708-275-6789, it used an "automated dialer system."

43.     Alternatively, when MAB called 708-275-6789, it used its "fully integrated Auto-Dialer system."

44.     If MAB obtained 708-275-6789 from BOA, it did not have consent to call Plaintiff because 708-275-6789 was no longer available to BOA once Plaintiff told it to stop calling him.  According to the January 4, 2008, Declaratory Ruling:

> where the subscriber has not made the number available to the creditor regarding the debt, we expect debt collectors to . . . comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to wireless numbers.

See FCC's January 4, 2008, Declaratory Ruling at ¶ 14 (footnotes omitted).

45.     Although MAB may contend that the equipment it used to call 708-275-6789, is neither an ATDS (as it is defined by the TCPA) or a predictive dialer, MAB cannot

say that an employee or agent of BOA used his or her fingers to *individually* dial, press

or click, *all ten numbers* of 708-275-6789.

46. Pursuant to the FCC's January 8, 2008, Ruling, BOA is liable for all

autodialed or predictively dialed calls and artificial or prerecorded voice messages that

MAB made to 708-275-6789.

47. The FCC's January 4, 2008 Ruling provides:

[A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call.

FCC's January 8, 2008 Ruling, p. 7 (footnote omitted).

284. Defendants also violated 47 CFR 64.1200(b)(1) if their artificial or

prerecorded voice telephone messages did not identify their full legal names.

48. MAB violated the FDCPA because MAB's placement of autodialed,

predictively dialed and/or prerecorded message calls to Plaintiff's cellular phone (after

he told BOA and MAB to stop calling him) constitute harassing, oppressive, abusive,

false, deceptive, misleading, unfair and unconscionable methods of debt collection.

49. BOA and MAB violated the ICFA because their placement of autodialed,

predictively dialed and/or prerecorded message calls to Plaintiff's cellular phone (after

he told BOA and MAB to stop calling him) constitutes an unfair methods of competition

as well as an unfair or deceptive acts or practice.

## Table of Contents

| | | |
|---|---|---|
| Section I | Jurisdiction and Venue | pp. 1-2 |
| Section II | Parties | p. 2 |
| Section III | Summary of Allegations and Claims | pp. 3-7 |
| Section IV | BOA's Policies and Practices | pp. 8-13 |
| Section V | BOA's Contract with MAB | pp. 13-14 |

| Section VI | MAB's Autodialer, Policies and Practices | pp. | 14-21 |
| Section VII | BOA's Communications With Plaintiff | pp. | 21-24 |
| Section VIII | BOA's Transmission of Plaintiff's Number to MAB | pp. | 24-25 |
| Section IX | MAB's Communications With Plaintiff | pp. | 25-29 |
| Section X | Causes of Action | pp. | 29-54 |
| Section X | The Elements of FRCP 23 Are Met | pp. | 55-59 |
| Section XI | The Proposed Classes Members are Ascertainable | pp. | 59-62 |

**IV.      BOA's Policies and Practices**[1]

**A.   BOA's Policies and Practices From January 1, 2017 to the Present**

50.     If persons with BOA credit card accounts ("consumers") wrote to BOA and told BOA to stop contacting them by telephone, it was BOA's policy to recognize consumers' do not call requests by documenting the consumers' accounts with a specific numeric code.

51.     If consumers wrote to BOA and told BOA to stop contacting them by telephone, it was BOA's policy to recognize consumers' do not call requests by documenting the consumers' accounts with a specific alpha/letter code.

52.     On information and belief, BOA ignored consumers' do not call requests and continued to call the consumers.

53.     On information and belief, BOA ignored consumers' do not call requests and continued to call the consumers with an ATDS or predictive dialer.

54.     Alternatively, on information and belief, if consumers wrote to BOA and told BOA to stop contacting them by telephone, pursuant to BOA's policy, BOA would *not* delete the consumers' telephone numbers.

---

[1] For the sake of clarity, unless otherwise specified, the relevant time period for the allegations is four years prior to the filing of this Class Action Complaint.

55.     On information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would not send the consumer's telephone numbers to a debt collector, if and when the consumer's account was sent to a debt collector for collection purposes.

56.     On information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would not send the consumer's telephone numbers to MAB for collection purposes.

57.     Alternatively, on information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would send the consumer's telephone numbers to a debt collector, if and when the consumer's account was sent to a debt collector for collection purposes.

58.     Alternatively, on information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would send the consumer's telephone numbers to MAB for collection purposes.

59.     If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call told BOA to stop calling, it was BOA's policy to recognize the consumer's do not call request by documenting the consumer's account with a specific numeric code.

60.     If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call told BOA to stop calling, it was BOA's policy to recognize the consumer's do not call request by documenting the consumer's account with a specific alpha/letter code.

61.     For example, if BOA called a consumer at 312-867-5309, and the person answering the phone said "I can't pay you, please, stop calling me", a BOA employee or agent would take some action to document this request with a code or typed words.

62. If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call asked BOA to stop calling, it was BOA's policy that it would *ignore* the consumer's request and *continue* to call the consumer's telephone number.

63. If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would not send the consumers' telephone numbers to a debt collector for collection purposes.

64. Alternatively, if a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to a debt collector for collection purposes.

65. If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to MAB for collection purposes.

66. If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to MAB for collection purposes.

67. On information and belief, when BOA's calls to consumers utilized artificial prerecorded voice messages, the messages did not refer to BOA as "Bank of America, National Association."

**B. BOA's Policies and Practices From November 13, 2013 to December 31, 2016**

68. If consumers wrote to BOA and told BOA to stop contacting them by telephone, it was BOA's policy to recognize consumers' do not call requests by documenting the consumers' accounts with a specific numeric code.

69.     If consumers wrote to BOA and told BOA to stop contacting them by telephone, it was BOA's policy to recognize consumers' do not call requests by documenting the consumers' accounts with a specific alpha/letter code.

70.     On information and belief, BOA ignored consumers' do not call requests and continued to call the consumers.

71.     On information and belief, BOA ignored consumers' do not call requests and continued to call the consumers with an ATDS or predictive dialer.

72.     Alternatively, on information and belief, if consumers wrote to BOA and told BOA to stop contacting them by telephone, pursuant to BOA's policy, BOA would *not* delete the consumers' telephone numbers.

73.     On information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would not send the consumer's telephone numbers to a debt collector, if and when the consumer's account was sent to a debt collector for collection purposes.

74.     On information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would not send the consumer's telephone numbers to MAB for collection purposes.

75.     Alternatively, on information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would send the consumer's telephone numbers to a debt collector, if and when the consumer's account was sent to a debt collector for collection purposes.

76.     Alternatively, on information and belief, if a consumer wrote to BOA and told BOA to stop contacting him or her by telephone, pursuant to BOA's policy, BOA would send the consumer's telephone numbers to MAB for collection purposes.

77.    If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call told BOA to stop calling, it was BOA's policy to recognize the consumer's do not call request by documenting the consumer's account with a specific numeric.

78.    If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call told BOA to stop calling, it was BOA's policy to recognize the consumer's do not call request by documenting the consumer's account with a specific alpha/letter code.

79.    If BOA called the cellular number of a consumer for the purpose of discussing a past due account, and the person answering the call asked BOA to stop calling, it was BOA's policy that it would *ignore* the consumer's request and *continue* to call the consumer's telephone number.

80.    If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would not send the consumers' telephone numbers to a debt collector for collection purposes.

81.    Alternatively, if a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to a debt collector for collection purposes.

82.    If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to MAB for collection purposes.

83.    If a consumer told a BOA employee or agent during an inbound or outbound phone conversation to stop calling, pursuant to BOA's policy, BOA would send the consumers' telephone numbers to MAB for collection purposes.

84. On information and belief, when BOA's calls to consumers utilized artificial prerecorded voice messages, the messages did not refer to BOA as "Bank of America, National Association."

### C. BOA's Policies and Practices from November 13, 2013 to the Present

85. If BOA used a numeric code to document written do not call requests, BOA consumer account records can be searched to identify all do not call requests.

86. If BOA used an alpha/letter code to document written do not call requests, BOA consumer account records can be searched to identify all do not call requests.

87. If BOA used a numeric code to document oral do not call requests, BOA consumer account records can be searched to identify all do not call requests.

88. If BOA used an alpha/letter code to document oral do not call requests, BOA consumer account records can be searched to identify all do not call requests.

### V.    BOA's Contract with MAB

89. During the relevant time period, BOA contracted with MAB for the purpose of having MAB collect consumer debts owed to BOA.

90. Under the terms of the contract(s) between BOA and MAB, BOA would compensate MAB for collecting the debts owed to BOA.

91. On information and belief, under the terms of the contract(s) between BOA and MAB, MAB would receive more compensation if it collected a higher percentage of the debts owed to BOA.

92. On information and belief, the terms of the contract(s) between BOA and MAB, identified the type of telephone dialing technology that MAB intended to use to call consumers to collect debts owed to BOA.

93.     On information and belief, when BOA entered into the contract(s) with MAB, BOA knew that MAB would use some form of automated telephone dialing technology to call consumers who owed money to BOA.

94.     On information and belief, when BOA entered into the contract with MAB, BOA knew that MAB employees would not use their fingers to individually dial, press or click all ten numbers of a consumer's number on a keyboard, traditional phone, computer screen or computer keypad.

95.     On information and belief, when BOA and MAB entered into the contract, BOA expected that MAB would comply if a consumer told MAB to stop calling.

96.     On information and belief, the contract between BOA and MAB required MAB to stop calling a consumer when a consumer told MAB to stop calling.

97.     On information and belief, the contract between BOA and MAB required MAB to document when consumers told MAB to stop calling.

98.     On information and belief, the contract between BOA and MAB required MAB to compile statistics to document when consumers told MAB to stop calling.

99.     On information and belief, the contract between BOA and MAB required MAB to inform BOA when a consumer verbally told MAB to stop calling the consumer.

100.    On information and belief, MAB expected that BOA would inform MAB if a consumer had told BOA to stop calling about the consumer's debt.

**VI.     MAB'S Automated Dialer System, Policies and Procedures**

101.    From at least January 1, 2017 through November 13, 2017, MAB's website at   https://www.mercantilesolutions.com/About.aspx   promoted that it uses a "automated dialer system."

102.    As recently as November 13, 2017, MAB's "About" webpage under the heading "ABOUT MERCANTILE ADJUSTMENT BUREAU" stated the following:

> Our operations are supported by integrated data and telephony technology that allows us to function transparently between various locations and seamlessly with our client partners. CUBS is our collection system as well as the system of record for all account information. It is integrated with our automated dialer system (Dial Connection), which is a 400 station virtual system with expansion capability.

See https://www.mercantilesolutions.com/About.aspx

103.    The quoted language existed on MAB's website in September of 2016.

104.    A true and accurate screenshot of "ABOUT MERCANTILE ADJUSTMENT BUREAU" as it looked on November 13, 2017 is depicted below:



105.    MAB used its "automated dialer system" when it called Plaintiff in an attempt to collect Plaintiff's BOA debts.

106.    As of January 1, 2017, MAB's website promoted that it uses a "fully integrated Auto-Dialer system." (https://www.mercantilesolutions.com/Services.aspx).

107.    MAB used its "fully integrated Auto-Dialer system" when it called Plaintiff in an attempt to collect Plaintiff's BOA debts.

108.  As recently as November 13, 2017, MAB's "Services" webpage stated the following:

**TECHNOLOGY**

Mercantile utilizes the Collector System produced by Columbia Ultimate as its collection platform. The Columbia Ultimate Collector System secures data by requiring a multiple password level entry, has menu driven parameters, and there are restrictions on available collector commands. We also use the fully integrated Auto-Dialer system which is fully expandable, allowing the best possible account penetration per agent.

See, https://www.mercantilesolutions.com/Services.aspx

109.  A true and accurate screenshot of MAB's "Services" page as it looked on November 13, 2017 is depicted below:



110.  MAB's website stated the following (as of November 13, 2017):

Mercantile is a full-service collection agency dedicated to providing a superior level of customer service while consistently meeting or exceeding client expectations. Our ability to develop customized programs with exceptional results has allowed us to have long lasting professional relationships with our clients.

See https://www.mercantilesolutions.com/Services.aspx

111.    MAB has provided a superior level of customer service while consistently meeting or exceeding client expectations.

112.    MAB has obtained exceptional results for clients.

113.    In order for MAB to provide a superior level of customer service while consistently meeting or exceeding client expectations, it was necessary for MAB to utilize its "automated dialer system" to telephone consumers.

114.    In order for MAB to obtain exceptional results for clients, it was necessary for MAB to utilize its "automated dialer system" to telephone consumers.

115.    In order for MAB to provide a superior level of customer service while consistently meeting or exceeding client expectations, it was necessary for MAB to utilize its "fully integrated Auto-Dialer system" to telephone consumers.

116.    In order for MAB to obtain exceptional results for clients, it was necessary for MAB to utilize its "fully integrated Auto-Dialer system" to telephone consumers.

117.    MAB used its "automated dialer system" to call consumers to collect debts between January 1, 2017, and November 12, 2017.

118.    MAB used its "automated dialer system" to call consumers to collect debts between January 1, 2016, and December 31, 2016.

119.    MAB used its "automated dialer system" to call consumers to collect debts between January 1, 2015, and December 31, 2015.

120.    MAB used its "automated dialer system" to call consumers to collect debts between January 1, 2014, and December 31, 2014.

121.    MAB used its "automated dialer system" to call consumers to collect debts between November 12, 2013, and December 12, 2013.

122.    MAB used its "fully integrated Auto-Dialer system" to call consumers to collect debts between January 1, 2017, and November 12, 2017.

123.   MAB used its "fully integrated Auto-Dialer system" to call consumers to collect debts between January 1, 2016, and December 31, 2016.

124.   MAB used its "fully integrated Auto-Dialer system" to call consumers to collect debts between January 1, 2015, and December 31, 2015.

125.   MAB used its "fully integrated Auto-Dialer system" to call consumers to collect debts between January 1, 2014, and December 31, 2014.

126.   MAB used its "fully integrated Auto-Dialer system" to call consumers to collect debts between November 12, 2013, and December 12, 2013.

127.   As of November 10, 2017, MAB's website stated that it trains its employees "[u]ndergo thorough training on how to utilize all skip trace tools available to the collectors as well as prioritizing sources so that they are most effective."

https://www.mercantilesolutions.com/Services.aspx

128.   MAB's use of skip trace technology helps its collectors track down consumers to help increase MAB's collection rates.

129.   The following is a true and accurate screenshot of MAB's "Client policy and Procedures Certification" on "Services" webpage as it looked on November 13, 2017:



130. On information and belief, based upon MAB's website representation, MAB employees received training to educate MAB collection associates and managers in the relevant policies, procedures, and specific requirements of BOA.

131. On information and belief, based upon MAB's website representation, MAB's Training Department, in conjunction with BOA, developed a training program related to the collection of consumer debts owed to BOA.

132. On information and belief, based upon MAB's website representation, MAB employees completed a comprehensive training program that encompassed BOA's policy procedures and work standards related to collecting consumer debts owed to BOA.

133. On information and belief, the objective of MAB and BOA's training program was to educate MAB's collection associates and managers about BOA's policies, procedures, and requirements with regard to calling consumers to collect BOA debts.

134. On information and belief, based upon MAB's development and implementation of MAB and BOA's training program, BOA learned that MAB uses an automated telephone dialing system to collect consumer debts owed to BOA during BOA and MAB's development and implementation of MAB and BOA's training program.

135. On information and belief, based upon MAB's development and implementation of MAB and BOA's training program, BOA learned that MAB used an "automated dialer system" to collect consumer debts owed to BOA.

136. On information and belief, based upon MAB's development and implementation of MAB and BOA's training program, BOA learned that MAB used a "fully integrated Auto-Dialer system" to collect consumer debts owed to BOA.

137. On information and belief, as part of MAB's development and implementation of MAB and BOA's training program, BOA learned that MAB used a predictive dialer.

19

138. On information and belief, when a consumer asked MAB to stop calling during a phone conversation, it was MAB's policy to require the MAB employee or agent to document the consumer's request with a specific numeric code.

139. On information and belief, when a consumer asked MAB to stop calling during a phone conversation, it was MAB's policy to require an employee or agent to document the consumer's request with a specific alpha/letter code.

140. On information and belief, when a consumer asked MAB to stop calling during a phone conversation, it was MAB's policy to require an employee or agent to document the person's request by typing the person's request into MAB's account notes for the consumer in question.

141. On information and belief, when a consumer asked MAB to stop calling during a phone conversation, it was MAB's policy to require an employee or agent to document the person's request by summarizing the person's request into MAB's account notes for the consumer in question with acronyms or abbreviations.

142. When MAB called the cellular number of a consumer for the purpose of collecting past due amount owed to BOA, and the person answering the call asked MAB to stop calling, it was MAB's policy to continue to call the consumer's telephone number.

143. If MAB has a policy or practice of ignoring consumers' "do not call" requests, and persistently calling these types of consumers, MAB's conduct would result in the collection of additional debts, resulting in higher profits.

144. If MAB used a numeric code to document oral do not call requests, MAB's collection account records can be searched to identify all do not call requests.

145. If MAB used an alpha/letter code to document oral do not call requests, MAB's collection account records can be searched to identify all do not call requests.

146.    When MAB's calls to debtors utilized prerecorded voice messages, the messages did not refer to MAB as "Mercantile Adjustment Bureau, LLC."

**VII.    BOA's Communications with Plaintiff**

147.    BOA's records will identify that it called Plaintiff at 708-275-6789 in December of 2016 and January of 2017 with regard to one or all of his BOA accounts [2]

148.    On information and belief, prior to calling 708-275-6789, BOA took some action to determine if 708-275-6789 was assigned to a cellular carrier.

149.    If BOA utilized a service to determine whether telephone numbers within its records were cellular numbers, BOA knew that 708-275-6789 was a cellular number when it called this number in 2017.

150.    On January 11, 2017, Plaintiff sent a letter to BOA ("Plaintiff's letter") which stated the following:

> I am requesting that you stop contacting me by telephone and direct all future communications to me in writing at the above address.

151.    On information and belief, BOA received Plaintiff's letter and scanned Plaintiff's letter into one of its computer databases.

152.    On information and belief, Plaintiff at 708-275-6789 on more than one occasion after January 11, 2017, through and into February, 2017.

153.    BOA's records will document if calls took place after January 1, 2017.

154.    Plaintiff has a plausible basis to believe that one or more of BOA's calls to 708-275-6789 used an automated telephone dialing system or some other form of automated dialing technology (such as a predictive dialer) for the following reasons:

---

[2] BOA cannot claim that it lacks knowledge or information sufficient to form a belief as to the truth of whether it called 708-275-6789 because its account records will identify that if placed calls to 708-275-6789.

     a.     BOA's website identifies that it uses as "automatic telephone dialing system";

     b.     in TCPA lawsuits BOA has admitted to making automated, auto-dialed and/or prerecorded calls to cellular phones of persons by virtue of admitting that "calls were initiated by dialing equipment", that its call logs tracked calls resulting in the designation "refused message" (which suggests an autodialed call and/or pre-recorded message), by admitting that a call result of "no answer" "results from dialing software detecting that the attempt was not connected or answered and no answering machine was reached" and by admitting that a designation of "disconnected call" "can result when the software detects a noise tone it associates with a disconnected call."

     c.     when Plaintiff was called by BOA he would answer call and would have to wait several seconds for someone from BOA to respond;

     d.     when a person responded to Plaintiff answering the phone, Plaintiff recalls hearing a "click" like noise followed by a sudden increase in background noise prior to a BOA representative responding;

     e.     Plaintiff recalls dropped calls when someone from BOA did not immediately respond to Plaintiff saying "hello";

     f.     a company the size of BOA would be unable to employee enough employees to manually place calls (by typing or pressing all ten digits of a consumer's number); and

     g.     on information and belief, calls placed by BOA left prerecorded and/or automated messages on Plaintiff's voice mail which is a hallmark of an automated dialer system.

155.    On information and belief, despite receiving Plaintiff's do not call letter, on information and belief, BOA continued to call 708-275-6789 using some form of automated dialing technology.

156.    Alternatively, despite receiving Plaintiff's do not call letter, BOA continued to call 708-275-6789 using a predictive dialer.

157.    When BOA called 708-275-6789 after January 11, 2017, no BOA employee or agent individually dialed, pressed or clicked, all ten numbers of 708-275-6789.

158.    On information and belief, despite receiving Plaintiff's letter, BOA called 708-275-6789 using a prerecorded or artificial message.

159.    If BOA called Plaintiff and utilized a prerecorded voice message, BOA's message did not refer to BOA as "Bank of America, National Association."

160.    On information and belief, when BOA called 708-275-6789 after receiving Plaintiff's January 11, 2017, letter, on at least one occasion, a male answered the call.

161.    The male who answered BOA's call told an agent or employee of BOA to stop calling.

162.    On information and belief, BOA's records show that it placed at least one other call to 708-275-6789 after the person (a male) told BOA to stop calling.

163.    On information and belief, BOA has a recording of it calling 708-275-6789 where a male answered the phone call, and told BOA to stop calling.

164.    On information and belief, BOA has at least forty recordings of outbound calls that it placed to consumers where consumers were recorded telling BOA to stop calling.

165.    On information and belief, BOA has at least forty recordings of inbound calls placed by consumers where consumers were recorded telling BOA to stop calling.

166.    On information and belief, BOA's records show that it called 708-275-6789 at least five times after January 11, 2017.

167.    On information and belief, BOA's records show that it called 708-275-6789 at least one time *after* a male answered the call told an agent or employee of BOA to stop calling.

168.    When BOA called 708-275-6789 after January 11, 2017, BOA knew that Section (b)(1)(A)(iii) of TCPA made it unlawful to make any call to cellular telephone using any automated telephone dialing system without the consent of the person being called.

23

169. When BOA called 708-275-6789, BOA was aware that the FCC's January 4, 2008, Declaratory Ruling stated that a predictive dialer is an automated telephone dialing system for the purposes of the TCPA.

**VIII.  BOA Transmission of Plaintiff's Number to MAB**

170. Sometime in 2017, BOA transmitted Plaintiff's account to MAB and the account data included the following:

      a.      telephone number 708-275-6789;

      b.      Plaintiff's address;

      c.      amounts owed by Plaintiff; and

      d.      date of last payments.

171. Even though Plaintiff wrote to BOA and told BOA to stop calling him, BOA transmitted his telephone number, 708-275-6789, to MAB.

172. Even though a male (Plaintiff) answered one of BOA's calls to 708-275-6789 and told an employee or agent of BOA to stop calling, BOA transmitted 708-275-6789 to MAB.

173. On information and belief, when BOA transmitted 708-275-6789 to MAB, BOA identified 708-275-6789 as a cellular number.

174. If BOA transmitted Plaintiff's telephone number, 708-275-6789, to MAB, BOA did so with the expectation that MAB would call 708-275-6789 using some form of automated dialing technology.

175. BOA transmitted Plaintiff's telephone number, 708-275-6789, to MAB, knowing that an MAB employee or agent *would not* use his or her fingers to individually dial, press or click all ten numbers of a consumer's number on a keyboard, traditional phone, computer screen or computer keypad.

176. Alternatively, BOA did not provide 708-275-6789 to MAB.

### IX.     MAB's Communications With Plaintiff

177.    Prior to calling 708-275-6789, MAB knew that Section (b)(1)(A)(iii) of TCPA made it unlawful to make any call to cellular telephone using any automated telephone dialing system without the consent of the person being called

178.    If BOA did not provide MAB with telephone number 708-275-6789, MAB obtained this number by using a skip-trace service.

179.    In 2008, the FCC instructed debt collectors to determine whether a consumer's number was assigned to a cellular carrier where a debt collector obtained a consumer's number from a source other than the creditor.

180.    According to the FCC's January 2008 Declaratory Ruling:

> We note, however, that where the subscriber [consumer] has not made the number available to the creditor regarding the debt, we expect debt collectors to be able to utilize the same methods and resources that telemarketers have found adequate to determine which numbers are assigned to wireless carriers, and to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to wireless numbers.

2008 FCC Ruling at ¶ 14.   https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-232A1.pdf

181.    The FCC's January 2008 Declaratory Ruling states that Neustar "provides data on numbers ported from wireline to wireless service on a daily basis."  2008 FCC Ruling at FN 54 (citing Neustar's website, https://www.tcpacompliance.us/).

182.    Neustar's website (as of November 9, 2017), promotes the following services under the heading, "Save Your Business from Unintentional TCPA Violations":

**Verify wireless phone numbers and subscribers in real time**
Instantly verify whether a specific phone number is wireless or wireline to learn if TCPA regulations apply – and verify the identity of the current subscriber to determine if they are the same party who provided you with consent.

**Leverage the most accurate, up-to-date data available**
Our TCPA Verification solutions are powered by the most accurate, comprehensive and up-to-date data in the industry, updated every 15 minutes from over 250 sources, including the nation's leading telecommunications service providers.

https://www.neustar.biz/risk/compliance-solutions/tcpa

183.   Neustar's services existed when MAB called Plaintiff's cellular number.

184.   A screenshot of Neustar's webpage is pasted below:



185.   If MAB utilized Neustar or a similar service to determine that telephone numbers within its records were assigned to cellular carriers, MAB knew or should have known that 708-275-6789 was a cellular phone when it called this number in 2017.

186.   On information and belief, MAB *did not* utilize Neustar or a similar service to determine whether Plaintiff's telephone number was assigned to a cellular carrier.

187.   MAB obtained 708-275-6789 by skip tracing Plaintiff and subsequently called this number using an ATDS.

188.   MAB obtained 708-275-6789 by skip tracing Plaintiff and subsequently called this number using a predictive dialing system.

189.   MAB never called 708-275-6789 where an employee of used his or her fingers to individually dial, press or click all ten numbers of a consumer's number on a keyboard, traditional phone, computer screen or computer keypad.

190. Plaintiff has a reasonable basis to believe that one or more of MAB's calls to 708-275-6789 used an ATDS or some other form of automated dialing technology (such as a predictive dialer) which is prohibited by the TCPA for the following reasons:

    a.    MAB's website says that it uses an "automated dialer system" and and a "fully integrated Auto-Dialer system" to contact consumers;

    b.    when Plaintiff was called by MAB he would answer call and would have to wait several seconds for someone from MAB to respond;

    c.    when a person responded to Plaintiff answering the phone, Plaintiff recalls hearing a "click" like noise followed by a sudden increase in background noise prior to a MAB representative responding;

    d.    Plaintiff recalls dropped calls when someone from MAB did not immediately respond to Plaintiff saying "hello";

    e.    a company the size of MAB would be unable to employee enough employees to manually place calls (by typing or pressing all ten digits of a consumer's number); and

    f.    calls placed by MAB left prerecorded and/or automated messages on Plaintiff's voice mail which is a hallmark of an automated dialer system.

191. When MAB called Plaintiff's telephone, Plaintiff answered at least one of the calls and told an employee or agent of MAB to stop calling him.

192. Despite Plaintiff having told MAB to stop calling him, MAB continued to call 708-275-6789 using an ATDS or some form of automated dialing technology.

193. Despite Plaintiff having told MAB to stop calling him, MAB continued to call 708-275-6789 using some form of dialing technology to make the call.

194. Despite Plaintiff having told MAB to stop calling him with regard to the BOA debt, MAB called 708-275-6789 without a person individually dialing, pressing or clicking, all ten numbers of 708-275-6789.

195. On information and belief, MAB's records show that it called 708-275-6789 after Plaintiff told MAB to stop calling.

196. Despite Plaintiff having told MAB to stop calling him, MAB called 708-275-6789 on at least one occasion where MAB used an artificial voice.

197. Despite Plaintiff having told MAB to stop calling him, MAB called 708-275-6789 on at least one occasion where MAB used a prerecorded voice.

198. If one of MAB's calls to Plaintiff utilized a prerecorded voice messages, the message did not refer to MAB as "Mercantile Adjustment Bureau, LLC."

199. If one of MAB's calls to Plaintiff utilized an artificial voice messages, the message did not refer to MAB as "Mercantile Adjustment Bureau, LLC."

200. MAB's computer systems documented when it called 708-275-6789.

201. MAB's computer systems documented when it called 708-275-6789 and played artificial and/or prerecorded messages.

202. On information and belief, MAB sent data to BOA that indicated that it had called 708-275-6789.

203. On information and belief, BOA was aware that MAB called 708-275-6789 after Plaintiff had written to BOA and asked BOA to stop calling him.

204. On information and belief, BOA was aware that MAB called 708-275-6789 after Plaintiff told MAB to stop calling him.

## X. CAUSES OF ACTION

205. Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

206. Plaintiff has suffered concrete harm as a result of Defendants' actions, including but not limited to, invasion of privacy, aggravation and emotional distress,

that accompanies automated collection telephone calls, and automated collection telephone calls that use artificial or prerecorded voice messages.

207.    The calls damaged Plaintiff because the calls preventing him from enjoying peace and solitude.

208.    The calls damaged Plaintiff because the calls and messages wasted minutes of his calling capacity, diminished cellular phone functionality and decreased battery life.

209.    Plaintiff was required to retain counsel to vindicate his rights under the TCPA, FDCPA and ICFA.

210.    In enacting the TCPA, Congress made specific findings that "unrestricted telemarketing can be an intrusive invasion of privacy" and are a "nuisance." Telephone Consumer Protection Act of 1991, Pub. L. 102–243, § 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991); *see also Mims v. Arrow Fin*. Servs., LLC, 132 S. Ct. 740, 745 (2012).

211.    As the Supreme Court has explained, Congress has the power to enact laws to elevate concrete harm "to the status of legally cognizable injuries." *Spokeo, Inc., v. Robbins*, 136 S. Ct. 1540, 1549 (2016).  "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.*  "[B]oth history and the judgment of Congress play important roles" in deciding whether a statutory violation is a concrete, de facto injury." *Id.*

212.    In enacting the TCPA, Congress sought to protect consumers from the unwanted intrusion and nuisance.

213.    The session law for the TCPA itself stated: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting

the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Id.

214. Actions to remedy a defendant's invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states. See Restatement (Second) of Torts § 652(B) (Am. Law Inst. 1977).

215. The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm.

216. Courts have held that TCPA alleged demonstrate concrete and legally cognizable harm. *See, e.g., Susinno v. Work Out World Inc.*, 862 F.3d 346, 348 (3d Cir. 2017) (holding that Article III standing existed where a TCPA plaintiff received a a "single solicitation" to her cell phone from a fitness company that resulted in the "receipt of [a] call and voicemail"); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding two unwanted text messages constituted a concrete injury under the TCPA, as they "present the precise harm and infringe the same privacy interests Congress sought to protect"); *Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306, 1311, 1312 (N.D. Ga. 2016) (rejecting application of *de minimis* rule to "a lone text message after withdrawal of consent" (internal quotation marks omitted) given "the [unambiguous] language of the TCPA . . . that a violation can occur from a single call" under § 227(b)(1)(A) in contrast to § 227(c)(5) which requires more than one call); *Cabiness v. Educ. Fin. Solutions, LLC*, 2016 U.S. Dist. LEXIS 142005, 2016 WL 5791411, at *5-6 (a violation of the TCPA "is sufficient on its own to constitute an injury in fact" because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm"); *Cour v. Life360, Inc.*, 2016 U.S. Dist. LEXIS

98945, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding concrete injuries where plaintiff alleged he received one text message in violation of the TCPA); *Meyer v. Bebe Stores, Inc.*, 2015 U.S. Dist. LEXIS 12060, 2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) (finding concrete injuries based on one alleged violation of the TCPA); *Smith v. Microsoft Corp.*, No. 11-CV-1958 JLS (BGS), 2012 U.S. Dist. LEXIS 101197, 2012 WL 2975712, at *6 (S.D. Cal. July 20, 2012) (finding "that by alleging he received a text message in violation of the TCPA, [plaintiff] has established a particularized injury in satisfaction of Article III premised on the invasion of his privacy"); *Hossfeld v. Compass Bank*, 2017 U.S. Dist. LEXIS 182571, *14-15 (N.D. Al. Nov. 3, 2017) ("Mr. Hossfeld has undoubtedly cleared the particularity hurdle and asserted a personal connection to the harm claimed that is sufficient to establish this prong of the standing requirement. The two unsolicited calls described in Ms. Hossfeld's first amended complaint were made to his personal cell phone number. (Doc. 12 at 4 ¶ 17). Mr. Hossfeld further alleges how those automatically-dialed calls impacted him personally—they temporarily deprived him from being able to use his cell phone, invaded his privacy, wasted his time, and reduced his cell phone's battery's life. (Doc. 12 at 7 ¶ 40)."

**WHEREFORE**, Plaintiff asserts the following causes of action:

### Count I - TCPA Violations Versus BOA

### *Auto/Predictive Dialed Calls Without Consent*

217. Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

218. Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using an automated telephone dialing system without the consent of the person called.

219.   Plaintiff is bringing Count I on behalf of himself and a nationwide class of similarly situated persons who were called by BOA after telling BOA, in writing and orally, to stop calling them.

220.   The FCC's January 8, 2008, Declaratory Ruling states "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."

221.   BOA never called Plaintiff's cellular telephone where an employee or agent used his or her fingers to *individually* dial, press or click, *all ten numbers* of 708-275-6789.

222.   BOA violated the TCPA by using an automated telephone dialing system or a predictive dialer to call Plaintiff's cellular telephone after he wrote to BOA and instructed BOA to stop calling him.

223.   On information and belief, more than 40 persons have been subject to similar conduct by BOA.

224.   On information and belief, BOA violated the TCPA by using an automated telephone dialing system or a predictive dialer to call Plaintiff's cellular telephone after Plaintiff spoke with an employee or agent of BOA and told BOA to stop calling him.

225.   On information and belief, more than 40 persons have been subject to similar conduct by BOA.

226.   The proposed class in this Count can be defined as:

All persons in the United States (a) whose cellular telephone number were called by BOA (b) where BOA's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

227.   Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not

contain the reference to whether BOA can or cannot demonstrate that it had consent to call the cellular numbers.

228.   The applicable time period for the proposed class is four years prior to filing of this Complaint.  See, 28 U.S.C. § 1658.

229.   The class is ascertainable and individualized issues of consent will not exist because BOA's policies require it to documented do not call requests through one or more of the following methods:  (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

230.   BOA's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 226.

231.   BOA can demonstrate consent to call consumers with the devices described in the proposed class definition where BOA's records do not show evidence of oral or written do not call requests.

232.   BOA's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each autodialed call after the recipient told BOA to stop calling.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a.  a declaration that Defendant BOA's conduct was unlawful;

b.  damages for unlawful each unlawful call;

c.  injunctive relief to preclude BOA from calling debtors with automated telephone dialing systems and/or predictive dialers without express consent to do so;

d. injunctive relief to preclude BOA from calling debtors with automated telephone dialing systems and/or predictive dialers where debtors have revoked consent in writing or verbally;

e. injunctive relief to require BOA to honor do not call requests.

### Count II - TCPA Violations Versus BOA

#### *For Artificial or Prerecorded Voice Recordings Without Consent*

233. Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

234. Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using artificial or prerecorded voice messages without the consent of the person called.

235. Plaintiff is bringing Count II on behalf of himself and a nationwide class of similarly situated persons who were called by BOA after telling BOA, in writing and orally, to stop calling them, and the calls contained artificial or prerecorded voice messages.

236. On information and belief, more than 40 persons have been subject to similar conduct by BOA.

237. The proposed Count II class can be defined as:

All persons in the United States (a) whose cellular telephone number were called by BOA (b) where BOA's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

238. Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not contain the reference to whether BOA had consent to call the cellular numbers in the manner described in Paragraph 237(b).

239. The applicable time period for the proposed class is four years prior to filing of this Complaint. See, 28 U.S.C. § 1658.

240. The class is ascertainable and individualized issues of consent will not exist because BOA's policies require it to documented do not call requests through one or more of the following methods: (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

241. BOA's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 237(b).

242. Defendant BOA's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each unlawful use of a prerecorded or artificial voice.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a. a declaration that Defendant BOA's conduct was unlawful;

b. damages for unlawful each unlawful artificial or prerecorded message;

c. injunctive relief to require BOA's to only leave artificial and/or prerecorded messages where it has express consent to do so; and

d. injunctive relief to require BOA to honor do not call requests.

### Count III - TCPA Violations Versus MAB

#### *Auto/Predictive Dialed Calls to BOA Consumers Without Consent*

190. Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by MAB for debts allegedly owed to BOA.

243. Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using an automated telephone dialing system without the consent of the person called.

244.    Plaintiff is bringing Count III on behalf of himself and a nationwide class of similarly situated BOA consumers who were called by MAB after they withdrew any possible consent by instructing BOA, in writing and orally, to stop calling them.

245.    The FCC's January 8, 2008, Declaratory Ruling states "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."

246.    As set forth above, MAB never called Plaintiff's cellular telephone where an employee or agent used his or her fingers to *individually* dial, press or click, *all ten numbers* of 708-275-6789.

247.    As set forth above, MAB violated the TCPA by using an automated telephone dialing system or a predictive dialer to call Plaintiff's cellular telephone *after* he wrote to BOA and instructed BOA to stop calling him and *after* he spoke with an employee or agent of BOA and told BOA to stop calling him.

248.    MAB did not have consent to call Plaintiff after he told BOA to stop calling him.

249.    MAB did not have consent to call Plaintiff after he told MAB to stop calling him.

250.    MAB did not have consent to call Plaintiff if MAB skip-traced his cellular number.

251.    On information and belief, more than 40 persons have been subject to similar conduct by MAB.

252.    The proposed class in Count III can be defined as:

All persons in the United States (a) whose cellular telephone number were called by MAB (b) to collect a debt owed to BOA (c) where MAB's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

253.   Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not contain the reference to whether MAB had consent to call the cellular numbers.

254.   The applicable time period for the proposed class is four years prior to filing of this Complaint.  See, 28 U.S.C. § 1658.

255.   The class is ascertainable and individualized issues of consent will not exist because BOA and MAB's policies require them to documented do not call requests through one or more of the following methods:  (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

256.   BOA and MAB's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 252.

257.   MAB can demonstrate consent to call consumers with the devices described in the proposed class definition where BOA and MAB's records do not show evidence of oral or written do not call requests.

258.   MAB's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each autodialed call after the recipient told BOA to stop calling.

259.   Because BOA is a creditor, it is liable for any of MAB's violations of the TCPA.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a.  a declaration that Defendant MAB's conduct was unlawful;

b.  a declaration that BOA is liable for MAB's conduct;

c. damages for unlawful each unlawful call;

d. injunctive relief to preclude MAB from calling debtors with automated telephone dialing systems and/or predictive dialers without express consent to do so;

e. injunctive relief to preclude MAB from calling debtors with automated telephone dialing systems and/or predictive dialers where debtors revoked consent in writing or verbally with BOA; and

f. injunctive relief to require MAB to honor do not call requests.

### Count IV - TCPA Violations Versus MAB

#### *Artificial and Prerecorded Voices Messages to BOA Consumers Without Consent*

191.    Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

192.    Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by MAB for debts allegedly owed to BOA.

260.    Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using an automated telephone dialing system without the consent of the person called.

261.    Plaintiff is bringing Count IV on behalf of himself and a nationwide class of similarly situated BOA consumers who MAB called after they withdrew any possible consent by instructing BOA, in writing and orally, to stop calling them.

262.    MAB did not have consent to call Plaintiff after he told BOA to stop calling him.

263.    MAB did not have consent to call Plaintiff after he told MAB to stop calling him.

264.    MAB did not have consent to call Plaintiff if MAB skip-traced his cellular number.

265.    On information and belief, more than 40 persons have been subject to similar conduct by MAB.

266. The proposed Count IV class can be defined as:

All persons in the United States (a) whose cellular telephone number were called by BOA (b) where BOA's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

267. Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not contain the reference to whether BOA had consent to call the cellular numbers in the manner described in Paragraph 266(b)

268. The applicable time period for the proposed class is four years prior to filing of this Complaint. See, 28 U.S.C. § 1658.

269. The class is ascertainable and individualized issues of consent will not exist because BOA and MAB's policies require them to documented do not call requests through one or more of the following methods: (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

270. BOA and MAB's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 266(b).

271. MAB's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each autodialed call after the recipient told BOA to stop calling.

272. Because BOA is a creditor, it is liable for any of MAB's violations of the TCPA.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a. a declaration that Defendant MAB's conduct was unlawful;

b. a declaration that BOA is liable for MAB's conduct;

c. damages for unlawful each unlawful artificial or prerecorded message; and

d. injunctive relief to prohibit MAB from leaving artificial and/or prerecorded messages without express consent to do so.

### Count V - TCPA Violations Versus MAB

#### *Auto/Predictive Dialed Calls to Debtors Without Consent*

193.    Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by MAB for debts allegedly owed to creditors other than BOA.

273.    Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using an automated telephone dialing system without the consent of the person called.

274.    Plaintiff is bringing Count V on behalf of himself and a nationwide class of similarly situated debtors who were called by MAB after they withdrew any possible consent by instructing by telling MAB during phone conversation to stop calling them.

275.    The FCC's January 8, 2008, Declaratory Ruling states "a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."

276.    As set forth above, MAB never called Plaintiff's cellular telephone where an employee or agent used his or her fingers to *individually* dial, press or click, *all ten numbers* of 708-275-6789.

277.    As set forth above, MAB violated the TCPA by using an automated telephone dialing system or a predictive dialer to call Plaintiff's cellular telephone *after* he spoke with an employee or agent of MAB and told MAB to stop calling him.

278.    MAB did not have consent to call Plaintiff after he told MAB to stop calling him.

279. MAB did not have consent to call Plaintiff if MAB skip-traced his cellular number.

280. On information and belief, more than 40 persons have been subject to similar conduct by MAB.

281. The proposed class in Count V can be defined as:

All persons in the United States (a) whose cellular telephone number were called by MAB (b) within four years of the filing of this Civil action (c) where MAB's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

282. Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not contain the reference to whether MAB had consent to call the cellular numbers.

283. The applicable time period for the proposed class is four years prior to filing of this Complaint. See, 28 U.S.C. § 1658.

284. The class is ascertainable and individualized issues of consent will not exist because MAB's policies require it to documented do not call requests through one or more of the following methods: (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

285. MAB's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 281.

286. MAB can demonstrate consent to call consumers with the devices described in the proposed class definition where BOA and MAB's records do not show evidence of oral or written do not call requests.

41

287.    MAB's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each autodialed call after the recipient told MAB to stop calling.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a. a declaration that Defendant MAB's conduct was unlawful;

b. damages for unlawful each unlawful call;

c. injunctive relief to preclude MAB from calling debtors with automated telephone dialing systems and/or predictive dialers without express consent to do so;

d. injunctive relief to preclude MAB from calling debtors with automated telephone dialing systems and/or predictive dialers where debtors revoked consent verbally with MAB; and

e. injunctive relief to require MAB to honor do not call requests.

### Count VI - TCPA Violations Versus MAB

#### *Artificial and Prerecorded Voices Messages to Debtors Without Consent*

194.    Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

195.    Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by MAB for debts allegedly owed creditors other than BOA.

288.    Section (b)(1)(A)(iii) of TCPA makes it unlawful to call a cellular telephone using an automated telephone dialing system without the consent of the person called.

289.    Plaintiff is bringing Count VI on behalf of himself and a nationwide class of similarly situated BOA consumers who MAB called after they withdrew any possible consent by instructing BOA, in writing and orally, to stop calling them.

290.    MAB did not have consent to call Plaintiff after he told MAB to stop calling him.

291.     MAB did not have consent to call Plaintiff if MAB skip-traced his cellular number.

292.     On information and belief, more than 40 persons have been subject to similar conduct by MAB.

293.     The proposed Count VI class can be defined as:

All persons in the United States (a) whose cellular telephone number were called by MAB (b) where MAB's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

294.     Because Defendant bears the burden of proof on whether it had consent to call Plaintiff and the proposed class members, the above class definition does not contain the reference to whether BOA had consent to call the cellular numbers in the manner described in Paragraph 293(b).

295.     The applicable time period for the proposed class is four years prior to filing of this Complaint. See, 28 U.S.C. § 1658.

296.     The class is ascertainable and individualized issues of consent will not exist because MAB's policies require it to documented do not call requests through one or more of the following methods: (a) the use of an alpha/letter code which can be readily searched; (b) the use of a numeric code which can be readily searched; (c) specified abbreviations and/or acronyms which can be searched within a consumer's account notes; and (d) summary notes which can be searched within a consumer's account notes.

297.     MAB's records can easily be searched for the times and dates of calls which are made in the methods set forth in Paragraph 293(b).

298.     MAB's violations of the TCPA renders it liable for a minimum of $500 per call and up to $1,500 for each artificial or prerecorded voice message after he told MAB to stop calling him.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

    a. a declaration that Defendant MAB's conduct was unlawful;

    b. damages for unlawful each unlawful artificial or prerecorded message;

    c. injunctive relief to preclude MAB from calling debtors with artificial or prerecorded message without express consent; and

    d. injunctive relief to prohibit MAB from leaving artificial and/or prerecorded messages without express consent to do so.

### Count VII – Violations of 47 CFR 64.1200(b)(1) versus BOA

285. Plaintiff incorporates each of the preceding allegations as if specifically stated herein

286. Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by BOA in violation of 47 CFR 64.1200(b)(1).

287. 47 CFR 64.1200(b)(1) requires that all artificial or prerecorded voice telephone messages must identify the full legal name of the party initiating the call.

288. According to 47 CFR 64.1200(b)(1):

(1) At the beginning of the message, **state** clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the **State** Corporation Commission (or comparable regulatory authority) must be stated[.]

289. **On information and belief,** artificial or prerecorded voice played by BOA during calls to Plaintiff did not contain BOA's legal name, Bank of America, National Association.

290. The FCC was authorized to enact 47 CFR 64.1200(b)(1) pursuant to Section 227(b)(2) of the TCPA which provides that the FCC "shall prescribe regulations to implement the requirements of this subsection."

291.    Section 227(b)(1 of the TCPA), which prohibits ATDS based calls and artificial or prerecorded voice messages without consent, is the subsection referenced by Section 227(b)(2).

292.    Section 227(b)(3) provides a private right of action for violations of the TCPA and the FCC's regulations:

> (3) Private Right of Action. A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—
>
> (A) an action based on a violation of this subsection *or the regulations prescribed under this subsection* to enjoin such violation[.]

(Emphasis supplied).

293.    The proposed Count VII class is defined as:

> All persons in the United States (a) whose cellular telephone number were called by BOA (b) where BOA's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and (c) the messages did not comply include MAB's legal name as registered in the 50 United States.

294.    Consent or revocation of consent is not an element of a claim brought pursuant to 47 CFR 64.1200(b)(1).

295.    The applicable time period for the proposed class is four years prior to filing of this Complaint.  See, 28 U.S.C. § 1658.

296.    The class is ascertainable because BOA documents when it leaves artificial and prerecorded voice messages with consumers and its records identify the particular message left, include the name used for BOA.

297.    BOA cannot move to stay the resolution of whether it violated 47 CFR 64.1200(b)(1) by pointing to the fully briefed Consolidated TCPA Appeal which is pending before the D.C. Circuit because the viability of 47 CFR 64.1200(b)(1) is not an issue before the D.C. Circuit.

298.    BOA's violations of 47 CFR 64.1200(b)(1) renders it liable for a minimum of $500 per call and up to $1,500 for each artificial or prerecorded voice message where Bank of America, National Association was not included in the message.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a. a declaration that Defendant BOA conduct was unlawful;

b. damages for unlawful each unlawful artificial or prerecorded message; and

c. injunctive relief to preclude BOA from calling consumers without using BOA's legal name, Bank of America, National Association.

### Count VIII – Violations of 47 CFR 64.1200(b)(1) versus MAB

299.    Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

300.    Plaintiff is bringing this Count on behalf of himself and a nationwide class of similarly situated persons who were called by MAB in violation of 47 CFR 64.1200(b)(1).

301.    47 CFR 64.1200(b)(1) requires that all artificial or prerecorded voice telephone messages must identify the full legal name of the party initiating the call.

302.    According to 47 CFR 64.1200(b)(1):

(1) At the beginning of the message, **state** clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the **State** Corporation Commission (or comparable regulatory authority) must be stated[.]

303.    On information and belief, artificial or prerecorded voice played by MAB during calls to Plaintiff did not contain MAB's legal name, Mercantile Adjustment Bureau, LLC.

304.   The FCC was authorized to enact 47 CFR 64.1200(b)(1) pursuant to Section 227(b)(2) of the TCPA which provides that the FCC "shall prescribe regulations to implement the requirements of this subsection."

305.   Section 227(b)(1), which prohibits ATDS based calls and artificial or prerecorded voice messages without consent is the subsection referenced by Section 227(b)(2).

306.   Section 227(b)(3) provides a private right of action for violations of the TCPA and the FCC's regulations:

> (3) Private Right of Action. A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—
>
>    (A) an action based on a violation of this subsection *or the regulations prescribed under this subsection* to enjoin such violation[.]

(Emphasis supplied).

307.   The proposed Count VIII class is defined as:

> All persons in the United States (a) whose cellular telephone number were called by MAB (b) where MAB's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and (c) the messages did not comply include MAB's legal name as registered in the 50 United States.

308.   Consent or revocation of consent is not an element of a claim brought pursuant to 47 CFR 64.1200(b)(1).

309.   The applicable time period for the proposed class is four years prior to filing of this Complaint.  See, 28 U.S.C. § 1658.

310.   The class is ascertainable because MAB documents when it leaves artificial and prerecorded voice messages with consumers and its records identify the particular message left, include the name used for MAB.

311.  MAB cannot move to stay the resolution of whether it violated 47 CFR 64.1200(b)(1) by pointing to the fully briefed Consolidated TCPA Appeal which is pending before the D.C. Circuit because the viability of 47 CFR 64.1200(b)(1) is not an issue before the D.C. Circuit.

312.  MAB's violations of 47 CFR 64.1200(b)(1) renders it liable for a minimum of $500 per call and up to $1,500 for each artificial or prerecorded voice message where Mercantile Adjustment Bureau, LLC, was not included in the message.

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

d.  a declaration that Defendant MAB conduct was unlawful;

e.  damages for unlawful each unlawful artificial or prerecorded message; and

f.  injunctive relief to preclude MAB from calling consumers without using MAB's legal name, Mercantile Adjustment Bureau, LLC.

### Count IX – Violations of FDCPA versus MAB

313.  Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

314.  Plaintiff is bringing his FDCPA claim on behalf of himself and a class of similarly situated residents of Illinois, Indiana and Wisconsin who were called by MAB with (a) an automated telephone dialing system or predictive dialer and (b) artificial or prerecorded messages after they revoked consent

315.  As a debt collector, MAB is in privity with BOA.

316.  Accordingly, Plaintiff's written or oral revocation of consent to BOA applies to MAB and precludes MAB from calling Plaintiff in violation of the TCPA.

317.  The same is true with regard to similarly situated residents of Illinois, Indiana and Wisconsin.  To the extent BOA's records show that residents of Illinois, Indiana and Wisconsin withdrew consent orally or in writing, class members' revocation

of consent to BOA applies to MAB and precludes MAB from calling class members in violation of the TCPA.

318.   "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.

319.   In violation of § 1692d, MAB harassed and abused Plaintiff and a class of Illinois residents by:

  a.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told BOA to stop calling them;

  b.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told MAB to stop calling them;

  c.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them; and

  d.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them.

320.   MAB violated § 1692d because it had no lawful or legal basis to continue to call Plaintiff and similarly situated Illinois, Wisconsin and Indiana residents with autodialed technology and artificial/prerecorded voice messages after they told BOA and MAB to stop calling them.

321.   "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.

322.   MAB violated § 1692e by:

  a.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told BOA to stop calling them;

    b.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told MAB to stop calling them;

    c.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them; and

    d.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them.

323.   MAB's conduct was deceptive and/or misleading to Plaintiff and the proposed class members because MAB had no lawful or legal basis to continue to call them with autodialed technology and artificial/prerecorded voice messages after they told BOA and MAB to stop calling them.

324.   Section 1692f of the FDCPA states that "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

325.   MAB violated § 1692f by:

    a.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told BOA to stop calling them;

    b.   continuing to call to Plaintiff and the proposed class members with an automated telephone dialing system or predictive dialer after they told MAB to stop calling them;

    c.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them; and

    d.   continuing to call to Plaintiff and the proposed class members using artificial or prerecorded messages after they told MAB to stop calling them.

326.   MAB's conduct was an unfair or unconscionable to Plaintiff and the proposed class members because it had no lawful or legal basis to continue to call them with autodialed technology and artificial/prerecorded voice messages after they told BOA and MAB to stop calling them.

327.    On information and belief, more than 40 persons have been subject to similar conduct by MAB.

328.    The proposed FDCPA class, Count IX, comprised of Illinois, Indiana and Wisconsin residents can be defined as follows:

> a. all residents of Illinois, Indiana and Wisconsin residents (b) who were called by MAB within one year of the filing of this Complaint  (c) where MAB's records show that it continued to call to Plaintiff (d) the class members with an automated telephone dialing system or predictive dialer after the class members told BOA in and MAB to stop calling them; and

> b. all residents of Illinois, Indiana and Wisconsin residents (b) who were called by MAB within one year of the filing of this Complaint  (c) where MAB's records show that it continued to call (d) the class members with electronically generated messages or recordings created before the phone calls took place (e) after the class members told MAB to stop calling them.

**WHEREFORE**, Plaintiff, on behalf of himself and a class of similarly situated persons from Illinois, Indiana and Wisconsin, seeks:

a. a declaration that Defendants BOA's conduct was unlawful;

b. declaration that Defendant MAB's conduct was unlawful;

c. statutory damages for Defendant MAB's unlawful conduct;

d. injunctive relief to preclude MAB from calling debtors with automated telephone dialing systems and/or predictive dialers without express consent to do so;

e. injunctive relief to require MAB to only leave artificial and/or prerecorded messages where it has express consent to do so; and

f. costs, and reasonable attorneys' fees.  See, 15 U.S.C. § 1692k.

### Count X – Consumer Fraud And Deceptive Practices Act vs. BOA and MAB

329.    Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

330.    Plaintiff is bringing this Count on behalf of himself and a class of similarly situated residents of Illinois.

331.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2, ("ICFA"), prohibits, *inter alia*, deceptive and unfair conduct, including but not limited to, false representations, false statements and omissions.

332.    Section 2 provides that:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

333.    Under the ICFA, an unfair act or practice is one that (a) offends public policy; (b) is immoral, unethical, oppressive or unscrupulous; or (c) causes substantial injury to consumers.

334.    With regard to Section 2 of the ICFA, it states that "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45]."

335.    Defendants' conduct in continuing to call Plaintiff with an automated telephone dialing system after Plaintiff told Defendants to stop calling him constitutes and unfair and deceptive practice under ICFA because Defendants' continued calls deprived Plaintiff of his right to tell Defendants that he did not consent to receive automated telephone calls or electronically generated messages or recordings created before the phone calls took place.

336.    Defendants' conduct in continuing to call Plaintiff with prerecorded messages after Plaintiff told Defendants to stop calling him constitutes and unfair and deceptive practice under ICFA because Defendants' continued calls deprived Plaintiff of his right to tell Defendants that he did not consent to receive calls the calls in question.

337. Defendants' conduct is unfair, immoral, unethical, oppressive and unscrupulous, and violates Illinois public policy, in that the conduct is prohibited by the Telephone Consumer Protection Act.

338. Additionally, Defendants' failure to comply with 47 CFR 64.1200(b)(1) is an unfair and deceptive practice under the ICFA.

339. Plaintiff and the proposed class member suffered harm as set forth above.

340. Consent is an affirmative defense that Defendants must prove. Accordingly, it is not contained within the below definitions.

341. The proposed class is defined as follows:

All persons in the state of Illinois, who (a) were called by BOA or MAB

MAB - Subclass One
All persons in the United States (a) whose cellular telephone number were called by MAB (b) within three years of the filing of this Civil action (c) where MAB's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

MAB - Subclass Two
All persons in the United States (a) whose cellular telephone number were called by MAB (b) within three years of the filing of this action (c) where MAB's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

MAB - Subclass Three
All persons in the United States (a) whose cellular telephone number were called by MAB (b) within three years of the filing of this action (c) where MAB's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and (d) the messages did not include MAB's full legal name of "Mercantile Adjustment Bureau, LLC."

BOA - Subclass One
All persons in the United States (a) whose cellular telephone number were called by BOA (b) within three years of the filing of this Civil action (c) where BOA's calls were made by an automated telephone dialing system, predictive dialer or some other technology what has been declared unlawful by the FCC.

BOA - Subclass Two

All persons in the United States (a) whose cellular telephone number were called by BOA (b) within three years of the filing of this action (c) where BOA's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place.

BOA - Subclass Three
All persons in the United States (a) whose cellular telephone number were called by BOA (b) within three years of the filing of this action (c) where BOA's calls included artificially created voices, prerecorded messages, or electronic messages created before the phone calls took place and (d) the messages did not include BOA's full legal name of "Bank of America, National Association."

**WHEREFORE**, Plaintiff, on behalf of himself and a nationwide class of similarly situated persons, seeks:

a. a declaration that Defendants BOA's conduct was unlawful;

b. declaration that Defendant MAB's conduct was unlawful;

c. damages for Defendant Defendants' unlawful conduct;

d. injunctive relief to preclude BOA and MAB from calling debtors with automated telephone dialing systems and/or predictive dialers without express consent to do so;

e. injunctive relief to require BOA and MAB to only leave artificial and/or prerecorded messages where it has express consent to do so;

f. injunctive relief to require BOA and MAB to utilize their full legal names in artificial and precorded voice messages; and

g. costs, and reasonable attorneys' fees. See, 15 U.S.C. § 1692k.

## XI.   The Elements of FRCP 23 Are Met

342.   Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

343.   Excluded from the Classes are: (1) Defendant, its agents, subsidiaries, parents, successors, predecessors, and any entity in which those parties, or their parents have a controlling interest, and those entities' current and former employees,

officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

344.   Plaintiff reserves the right to modify the class definitions to negate any efforts by Defendant to suggest that the above classes are failsafe classes.

345.   Plaintiff seeks injunctive relief to preclude Defendant from calling him and others similarly situated in violation of the TCPA and FDCPA.

### A.  Numerosity

346.   The element of numerosity is satisfied because Defendants called hundreds of persons like Plaintiff (a) through dialing technology prohibited by the TCPA (either an ATDS, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

347.   Accordingly, the joinder of all members of the Class is impracticable.

348.   Plaintiff believes there are thousands of Class members based upon Defendant's standing as one of the Nation's largest finance companies.

349.   Class members can be easily identified through Defendant's records or by other means.  *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (finding that the plaintiff's proposed class was ascertainable because the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

### B.  Commonality and Predominance

350.   The elements of is commonality and predominance are satisfied.

351.   As to the TCPA based classes, commonality exists because Defendant acted in a common manner toward Plaintiff and the proposed class members by calling Plaintiff and the proposed class members in the same way:   (a) through dialing technology prohibited by the TCPA (either an ATDS, predictive dialer, prerecorded messages and/or artificial messages) and (b) without consent of the person called.

352.   There are several questions of law and fact common to the claims of Plaintiff and members of the TCPA classes, including:

a.   Whether the calls placed to the cellular phones belonging to Plaintiff and Class members are violations of the TCPA;

b.   Whether Defendant's actions in continuing to place autodialed and automated calls after consent has been revoked violates the TCPA;

c.   Whether Defendant's conduct described herein was part of a pattern of noncompliance with the TCPA; and

d.   Whether Defendant's conduct described herein was intentional.

166.   Common questions predominate over any individual issues.

167.   There are several questions of law and fact common to the claims of Plaintiff and members of the FDCPA classes, including: whether the dialing systems used by Defendants qualify as automated telephone dialing systems under the TCPA; whether messages used by Defendant BOA qualify as artificial or prerecorded messages under the TCPA; whether the calls violated the TCPA and Sections 1692d, 1692e and 1692f of the FDCPA and ICFA; whether Defendants can demonstrate consent; and whether Defendant's conduct described herein was intentional so as to warrant treble damages.

**C. Typicality**

168.   Plaintiff's claims are typical of the claims of the proposed Class, as the call that Defendant placed to his cellular phone (after he revoked any purported consent to

be contacted by Defendant on his cellular phone) were the same or substantially similar to those received by the proposed class members.

169.   Plaintiff's and the proposed class members' claims all arise from the same operative facts and are based on the same legal causes of action.

170.   Plaintiff and each of the proposed class member are all subject to the same illegal calling techniques employed by Defendant.

### D. Appropriateness and Superiority

171.   A class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy.

172.   The common questions of law and fact enumerated above predominate over questions affecting only individual Class members.

173.   The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

174.   As such, the expense and burden of individual litigation would make it impracticable for proposed Class members to prosecute their claims individually.

175.   The trial and the litigation of Plaintiff's and Class members' claims are manageable.

### E.  Plaintiff and His Counsel Will Adequately Represent the Class

176.   Plaintiff will fairly and adequately represent and protect the interests of the Class.

177.   Plaintiff has no interest antagonistic to those of the Class.

178.   Defendant does not have any defenses unique to Plaintiff.

179.   Neither Plaintiff nor his counsel will have any interests that might cause them not to vigorously pursue this claim.

180.   Plaintiff's lead attorney (James C. Vlahakis) is an experienced consumer class action litigator.

181.   Mr. Vlahakis has defended over a hundred consumer-based claims.

182.   Mr. Vlahakis has defended TCPA class actions since 1998

183.   Mr. Vlahakis has litigated over three dozen TCPA based putative class actions

184.   Based upon nearly twenty years of experience, Mr. Vlahakis understands the defense typically utilized by creditors and debt collectors in TCPA litigation.

185.   In conjunction with counsel for the class members, Mr. Vlahakis obtained Court approval has obtained approval of various TCPA class actions. *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar ATDS based settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar ATDS wrong party settlement); *INSPE Associates v. CSL BIotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement).

186.   Mr. Vlahakis has successfully defeated a TCPA based class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013).

187.   Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. DIst. LEXIS 188745 (N.D. Ill. June 6, 2012).

188.   Additionally, Mr. Vlahakis (as a former consumer class action defense attorney) has gained court approval of dozens of numerous FDCPA class actions.

189.   As a former consumer class action defense attorney, Mr. Vlahakis has a vast level of knowledge which will assist him in advocating for Plaintiff and the putative

class members. Additionally, Mr. Vlahakis has successfully ascertained the identities of putative class members individually and in conjunction with industry experts.

190. Finally, Mr. Vlahakis has filed two petitions for declaratory relief before the Federal Communications Commission.

191. Plaintiff's other counsel are highly competent and experienced class action attorneys.

### F. Injunctive and Declaratory Relief Are Warranted

192. FRCP 23(b)(2) provides that injunctive and declaratory relief are proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class."

193. Here, the above violations apply generally to the proposed classes.

194. For the above reasons, this Court should declare Defendants' misconduct unlawful and enjoin Defendants from further violating the TCPA, FDCPA and ICFA.

### XII. The Proposed Class Members Are Ascertainable

353. Plaintiff incorporates each of the preceding allegations as if specifically stated herein.

354. The proposed class members are ascertainable through a review of BOA and MAB's business records. *See, e.g., In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 397 (3d Cir. 2015) (finding that the plaintiff's proposed class was ascertainable because the defendant "possesse[d] all of the relevant bank records needed to identify the putative class members").

355. As set forth below, on information and belief, and in accordance with recognized business standards for creditors and collection agencies, BOA and MAB gather data and maintain the following data.

356.    BOA maintains a searchable database of records which identify the following information:

A.    the names, telephone numbers and addresses of persons that owed consumer debts to BOA;

B.    telephone numbers which it identified as cellular numbers through commercially available services;

C.    telephone numbers which it identified as cellular numbers through its own software programs or databases;

D.    copies of do not call/cease and desist letters sent by consumers to BOA;

E.    account note entries which reflect BOA's receipt of do not call/cease and desist letters;

F.    the numbers called, and times and dates of autodialed calls being placed by BOA after BOA's receipt of do not call/cease and desist letters;

G.    the numbers called, and times and dates of prerecorded and artificial voice messages being placed by BOA after BOA's receipt of do not call/cease and desist letters;

H.    typed summaries and/or acronyms or abbreviations of oral do not call requests received by BOA (for example, BOA has admitted in TCPA litigation that the phrase "indicated wrong number" "is a code placed by BANA representatives."

I.    alpha/letter and/or numerically coded notations of oral do not call requests received by BOA;

J.    identify the numbers called, and times and dates of autodialed calls placed by BOA after its receipt of oral do not call requests;

K.    the numbers called, and times and dates of prerecorded and artificial voice messages placed by BOA after BOA's receipt of oral do not call requests;

L.    identify the numbers called, and times and dates of autodialed calls placed by MAB;

M.    the numbers called, and times and dates of prerecorded and artificial voice messages placed by MAB;

N.    alpha/letter and/or numerically coded notations of oral do not call requests received by MAB;

O.      identify the numbers called, and times and dates of autodialed calls placed by MAB after MAB received oral do not call requests;

P.      the numbers called, and times and dates of prerecorded and artificial voice messages placed by MAB after oral do not call requests;

Q.      telephone numbers which it identified as cellular numbers; and

R.      telephone numbers that it provided to MAB.

357.     MAB maintains a searchable database of records which identify the following information:

A.      the telephone numbers that it obtained from BOA;

B.      the telephone numbers that it obtained from skip tracing;

C.      the names, telephone numbers and addresses of persons that it called to collect BOA debts;

D.      the names, telephone numbers and addresses of persons that it called to collect for all other BOA debts;

E.      telephone numbers which it identified as cellular numbers through commercially available services;

F.      telephone numbers which it identified as cellular numbers through its own software programs or databases;

G.      the numbers called, and times and dates of prerecorded and artificial voice messages placed by MAB where BOA's records show that consumers had originally asked BOA to stop calling in writing;

H.      the numbers called, and times and dates of prerecorded and artificial voice messages placed by MAB where BOA's records show that consumers had originally asked BOA to stop calling during phone conversations;

I.      account note entries which reflect MAB's receipt of do not call/cease and desist letters;

J.      typed summaries and/or acronyms or abbreviations of oral do not call requests received by MAB;

K.      alpha/letter and/or numerically coded notations of oral do not call requests received by BOA;

L.      the numbers called, and times and dates of autodialed calls placed by MAB after its receipt of oral do not call requests.

M. the numbers called, and times and dates of prerecorded and artificial voice messages placed by MAB after its receipt of oral do not call requests; and

N. numbers called, and times and dates of autodialed calls placed by MAB after its receipt of oral do not call requests;

358. The above records can be searched to identify the proposed class members.

**WHEREFORE**, for the reasons set forth above, Plaintiff NEAL PRESTON, individually, and on behalf of all others similarly situated, respectfully requests that this Honorable Court certify the above classes and award judgment in Plaintiff's favor on behalf of the proposed classes and against Defendants and award the relief requested.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

## DOCUMENT PRESERVATION REQUEST

Plaintiff requests that Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, or file associated with Plaintiff, and any account or number or symbol relating to Plaintiff. Plaintiff also demands that Defendants take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to the proposed class members, the events described herein, any third party associated with any telephone call, campaign, account, or file associated with the proposed class member, and any account or number or symbol relating to the proposed class members.

These materials are likely very relevant to the litigation of this claim. If Defendants are aware of any third party that has possession, custody, or control of any

such materials, Plaintiff demands that Defendants request that such third party also take steps to preserve the materials.

This demand shall not narrow the scope of any independent document preservation duties of Defendants.


Respectfully submitted,

*Plaintiff NEAL PRESTON,*
*individually, and on behalf*
*of all others similarly situated,*


By*:   /s/ James Vlahakis*
James Vlahakis (lead counsel)
jvlahakis@sulaimanlaw.com

Ahmad T. Sulaiman
ahmad.sulaiman@sulaimanlaw.com
Omar T. Sulaiman
osulaiman@sulaimanlaw.com
Mohammed O. Badwan
MABdwan@sulaimanlaw.com
Nathan C. Volheim
nvolheim@sulaimainlaw.com

SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630) 581-5456 telephone
(630) 575-8188 facsimile